**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANDREW JONES,<br>3310 Clay Place Ne<br>Washington, DC 20019<br><br>     Plaintiff,<br><br>v.<br><br>DISTRICT OF COLUMBIA<br>Office of the Attorney General<br>441 4th Street NW, 6th Floor South<br>Washington, DC 20001<br><br>HOPE VILLAGE, INC.<br>2840 Langston Pl SE<br>Washington, DC 20020<br><br>WILLIAM SMITH<br>Warden, Central Detention Facility<br>1901 D St SE<br>Washington, DC 20003<br><br>SHEILA ADEGBIE<br>Community Supervision Assistant<br>Court Services And Offender Supervision Agency<br>1418 Good Hope Rd. SE<br>Washington, DC 20020<br><br>JOHN OR JANE DOE 1<br>Unnamed Officer or Employee<br>United States Attorney's Office for the<br>District of Columbia<br>555 4th St. NW<br>Washington, DC 20530<br><br>JANE DOE 2<br>Unnamed Case Manager for Northwest Unit 1<br>Central Detention Facility<br>1901 D St SE<br>Washington, DC 20003 | **COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>**CASE NO.** _____ |

1

JOHN DOE 3                                                          )
Unnamed Metropolitan Police Department Officer                     )
Office of General Counsel                                          )
300 Indiana Ave., NW                                               )
Room 4115                                                          )
Washington, DC 20001                                               )
                                                                   )
JOHN OR JANE DOE 4 & 5                                             )
Unnamed Legal Instrument Examiners                                 )
D.C. Department of Corrections                                     )
1923 Vermont Avenue, NW                                            )
Washington, DC 20003                                               )
                                                                   )
JOHN OR JANE DOES 6-10                                             )
Unnamed Officers and Employees                                     )
D.C. Department of Corrections                                     )
1923 Vermont Avenue, NW                                            )
Washington, DC 20003                                               )
                                                                   )
JOHN OR JANE DOES 11-15                                            )
Unnamed Officers and Employees                                     )
United States Marshals Service                                     )
Office of General Counsel                                          )
12th Floor                                                         )
Washington, DC 20530                                               )
                                                                   )
JOHN OR JANE DOES 16-20                                            )
Unnamed Officers or Employees                                      )
Federal Bureau of Prisons                                          )
Office of General Counsel, Central Office                          )
320 First St., NW                                                  )
Washington, DC 20534                                               )
                                                                   )

## **COMPLAINT**

Plaintiff Andrew Jones, by and through his attorneys, brings the following action for

damages under the District of Columbia Code, the District of Columbia Common Law, *Bivens v.*

*Six Unknown Named Agents*, 403 U.S. 388 (1971), and 42 U.S.C. § 1983, and alleges as follows:

## NATURE OF THE ACTION

1.      This is a civil rights action to recover damages for the unlawful arrests and incarceration of Plaintiff Andrew Jones from November 5, 2014 to January 2, 2015.  For this two-month period, Mr. Jones languished in the Central Detention Facility (CDF) of the D.C. Department of Corrections (DOC) as a result of an invalid escape charge that was never even papered.  He was never brought before a judge, and CDF officials ignored his repeated pleas that his detention was a mistake.  Making matters worse, his detention coincided with Thanksgiving and Christmas, devastating his wife and young daughters, who were eagerly anticipating their first holiday as a family in five years.  That no one at CDF would verify the legal basis of his detention is mind-boggling, particularly since the federal and D.C. governments were put on notice of the risk of wrongful detention by a 2009 lawsuit presenting the *exact same* factual scenario.  Mr. Jones now seeks compensation from the individuals and entities that falsely arrested and imprisoned him, deprived him of due process, breached their duties of care, and were deliberately indifferent to his constitutional rights.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction under 28 U.S.C. § 1331 and the United States Constitution for the federal claims.

3.      This Court has supplemental jurisdiction over D.C. common law claims 28 U.S.C. § 1367 and *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966), as all state and common law claims asserted herein arise from the same nucleus of operative facts as the federal claims.

4.      Venue is proper in this district under 28 U.S.C. § 1391.  A substantial part of the events or omissions alleged herein occurred within the District of Columbia.

5.      Mr. Jones complied with the administrative exhaustion requirements of D.C. Code § 12-309 by providing notice of his claims to the D.C. Office of Risk Management within six months of his release from incarceration.

## PARTIES

6.      Plaintiff Andrew Jones ("Mr. Jones") is a citizen of the United States residing at 3310 Clay Place NE, Washington, DC 20019.

7.      The District of Columbia is a municipality and the legal entity responsible for the tortious acts and omissions of the individuals employed by the D.C. Department of Corrections (DOC) and the Metropolitan Police Department (MPD).

8.      Defendant Hope Village, Inc. ("Hope Village") is a private entity doing business in the District of Columbia that operates a community correctional institution through contractual relationships with the United States of America and the District of Columbia.  Hope Village is located at 2840 Langston Pl. SE, Washington, D.C. 20020.

9.      Defendant William Smith is an individual who was, at all times relevant to this Complaint, the Warden of CDF.

10.     Defendant Sheila Adegbie is an individual employed as the Community Supervision Assistant of Team 14 by the Court Services and Offender Supervision Agency ("CSOSA"), 633 Indiana Avenue, NW, Washington, DC 20004.  Ms. Adegbie supervises Team 14, which is located at located at 1418 Good Hope Rd. SE, Washington, DC 20020.  At all times relevant to this Complaint, Ms. Adegbie was responsible for supervising Mr. Jones's reentry into society following the completion of his federal prison sentence in support of CSOSA's core mission to "support the fair administration of justice by providing timely and accurate information and meaningful recommendations to criminal justice decision-makers."

4

11.     Defendant John or Jane Doe 1 is an individual with name currently unknown who was, at all times relevant to this Complaint, an employee of the United States Attorney's Office for the District of Columbia responsible for ensuring Mr. Jones was released when no charges were filed against him in the Superior Court of the District of Columbia.

12.     Defendant Jane Doe 2 is an individual with name currently unknown who was, at all times relevant to this Complaint, employed by the D.C. Department of Corrections as the case manager for Northwest Unit 1, where Plaintiff was housed.

13.     Defendant John Does 3 is an MPD officer with names currently unknown who arrested Plaintiff on November 5, 2014.

14.     Defendant John or Jane Does 4 & 5 are legal instrument examiners with names currently unknown responsible for ensuring that inmates at CDF are lawfully detained.

15.     Defendants John or Jane Does 6-10 are individuals with names currently unknown who were, at all times relevant to this Complaint, employees of the D.C. Department of Corrections responsible for physically detaining and strip-searching Plaintiff.

16.     Defendants John or Jane Does 11-15 are individuals with names currently unknown who were, at all times relevant to this Complaint, employees of the United States Marshals Service (USMS) responsible for physically detaining and transporting Plaintiff at the Superior Court for the District of Columbia.

17.     Defendants John or Jane Does 16-20 are individuals with names currently unknown who were, at all times relevant to this Complaint, employed by the Bureau of Prisons and responsible for determining Mr. Jones's custodial status.

## FACTUAL BACKGROUND

18.     On March 19, 2014, Plaintiff Andrew Jones was discharged from the Federal Correctional Institution in Morgantown, WV after serving the bulk of a five-year sentence in D.C. Superior Court Case No. 2009 CF2 012541.

19.     Mr. Jones was transferred by the Federal Bureau of Prisons (BOP) to the Hope Village halfway house in Washington, D.C. to complete the remaining six months of his sentence in community confinement.  He was scheduled to complete his sentence on November 3, 2014.

20.     Mr. Jones obtained employment in the community pursuant to the community corrections program at Hope Village.

21.     On October 10, 2014, Mr. Jones signed out of Hope Village to go to work, but failed to report to his place of employment.

22.     On information and belief, an employee of Hope Village filed a notice of escape with the BOP due to Mr. Jones's failure to report to his assigned workplace.

23.     Mr. Jones returned to Hope Village before the 6pm curfew, as required by his program.

24.     On October 11, 2014, Mr. Jones was informed by Hope Village that as a consequence of his failure to report to work the previous day, the BOP had ordered him to be placed on "no movement" status at Hope Village for the remaining three weeks of his sentence.

25.     Mr. Jones completed the remainder of his sentence without incident.

26.     On November 3, 2014, having completed his sentence, Mr. Jones was released from Hope Village with instructions to report within 72 hours to the Court Services and Offender

Supervision Agency (CSOSA), General Supervision, Team 14, located at 1418 Good Hope Rd. SE, Washington, DC 20020.

27.     Mr. Jones was provided with a paper printout of his CSOSA assignment by Hope Village as a release paper.  The printout stated, "YOU HAVE BEEN ASSIGNED TO REPORT TO THE FOLLOWING SUPERVISION OFFICE:  General Supervision – Team 14." The date of Mr. Jones's official release from Hope Village was evident from the auto-generated date on the bottom of the printout, which was November 3, 2014.  The bottom of the printout also indicated that it was printed from a secured CSOSA network site beginning with the url: "https://smart.csosa.gov/DesktopModules/Intake/Assignment/AssignmentInfo...."

28.      On November 4, 2014, Mr. Jones had a joyous reunion with his family, including his wife, 14-year old step-daughter, and 9-year-old daughter.  His wife began making plans to celebrate Mr. Jones's return to society with a banquet for friends and family.

29.     On November 5, 2014, Mr. Jones went early to the office of CSOSA to begin his period of supervision.  Upon his arrival, Mr. Jones began to be interrogated by Community Supervision Assistant Sheila Adegbie concerning the date that he left Hope Village. Ms. Adegbie incorrectly believed that Mr. Jones left the Hope Village on October 10, 2014—the day he missed work—and that he had never returned.

30.     Mr. Jones repeatedly told Ms. Adegbie that he had returned to Hope Village and completed his sentence, and that he was formally released by Hope Village on November 3, 2014 with instructions to report to CSOSA.  In addition, Mr. Jones showed Ms. Adegbie the release papers provided to him by Hope Village, which were dated November 3, 2014.  On information and belief, Ms. Adegbie had access to the electronic data underlying the release paper, since it was printed from a secure CSOSA website.

31.     Mr. Jones urged Ms. Adegbie to call Hope Village to verify his account.  Instead, Ms. Adegbie called the MPD to effectuate Mr. Jones's arrest.  Upon their arrival, Ms. Adegbie informed Mr. Jones he would have to be arrested pursuant to a warrant in connection with his October 10, 2014 "escape" from Hope Village.

32.     Mr. Jones informed the arriving MPD officers that he had completed his sentence and had been officially released from Hope Village on November 3, 2014.  He again showed them his release papers and urged them to call Hope Village to obtain the specifics of his release date.  Rather than call Hope Village, however, unnamed MPD officer John Doe 3 arrested him.

33.     It is not clear why Ms. Adegbie believed Mr. Jones had never returned to Hope Village on October 10, 2014.  If the notice of escape issued by Hope Village resulted in a warrant for Mr. Jones's arrest, such a warrant should have been retracted by the BOP, the U.S. Attorney's Office, and/or USMS when Mr. Jones returned to Hope Village prior to his curfew.

34.     On information and belief, Hope Village failed to appropriately communicate with BOP, the U.S. Attorney's Office, and/or USMS regarding Mr. Jones's return to Hope Village before the 6:00pm curfew, as required by its contract with BOP and applicable BOP Program Statements describing escape procedures.

35.     On information and belief, Hope Village also failed to update Mr. Jones's custodial status and sentence calculation within the BOP's SENTRY computer system. SENTRY is a real-time information system consisting of various applications for processing sensitive but unclassified inmate information and for property management.  Data collected and stored in the system includes information relating to the care, classification, subsistence, protection, discipline, and programs of federal inmates, including the computation of sentence and supporting information; information concerning pending charge, wanted status, and

8

warrants; information relating to notification to other federal and non-federal law enforcement agencies prior to the inmate's release; and records of the allowance, forfeiture, withholding and restoration of good time.  SENTRY has also been modernized to take advantage of web-based technologies.

36.     Hope Village also failed to inform Mr. Jones that there was a warrant for his arrest while he was in Hope Village's custody, and failed to appropriately communicate with CSOSA regarding Mr. Jones's status and the completion of his sentence.

37.     If a warrant did exist for Mr. Jones's arrest for escaping from Hope Village on October 10, 2014, it was objectively unreasonable for unnamed MPD officer John Does 3 to rely on it in arresting Mr. Jones on November 5, 2014, since Mr. Jones showed him documentary proof that he had been formally released by Hope Village on November 3, 2014, and thus could not have escaped from Hope Village.  At a minimum, the officer should not have arrested Mr. Jones without at least placing a phone call to Hope Village to investigate Mr. Jones's claims.

38.     Following his arrest, Mr. Jones was taken to 6th District precinct.  His belongings were collected and catalogued, including the printout from Hope Village proving that he had been formally released on November 3, 2014.  This deprived Mr. Jones of his main tool for demonstrating his completion of his sentence and release date from Hope Village.

39.     After being held for two hours, Mr. Jones was transferred to CDF's Central Cell Block to stay overnight.  Like all arriving arrestees, Mr. Jones was subjected to an invasive body-cavity search at CDF.

40.     The next morning, November 6, 2014, Mr. Jones was transported to the holding area of the Superior Court of the District of Columbia, where he was placed in the custody of USMS.  According to the lockup list from that day, Mr. Jones was scheduled to be arraigned for

the charge of "Escape from an institution or officer."  Like the other inmates scheduled for

arraignment, Mr. Jones was moved into a cell behind the arraignment court by USMS officers to

await the calling of his number for his appearance before a judicial officer.

41.     Mr. Jones did not appear before a judicial officer, however.  On information and

belief, Mr. Jones's case was "no papered" by unnamed Assistant United States Attorney John or

Jane Doe 2 at some point prior to arraignment.

42.     When his case was "no papered," Mr. Jones should have been immediately

processed for release.  Despite knowing that they had not brought Mr. Jones before a judicial

officer, however, unnamed USMS officers John or Jane Does 11-15 instead ordered Mr. Jones to

return to CDF.  When Mr. Jones protested that he had not yet seen a judge, the USMS officers

ignored his pleas and transported him anyway.

43.     Mr. Jones was taken back to CDF, where he was again subjected to an invasive

search of his body cavities.

44.     After being searched, Mr. Jones was processed for intake by CDF intake officers,

including John or Jane Does 4 & 5, and placed into Northwest Unit 1.

45.     Mr. Jones was allowed a single brief phone call by CDF.  He called his wife, who

for more than a day did not know where Mr. Jones was.  Mr. Jones tried to explain that he

needed money to fund further calls, but he was unable to communicate the details of what he

needed in the time allotted for his call.  As a result, Mr. Jones was left stranded in CDF with no

ability to call anyone, with no attorney to represent him, and no case-control dates to ensure he

would be seen by a judicial officer.

46.     The next day, Mr. Jones saw unnamed Defendant Jane Doe 2, the case manager

for inmates in Northwest Unit 1.  When Mr. Jones asked her why he was being held at CDF, she

stated that he was being held for "escape."  Mr. Jones explained that he had returned to Hope Village prior to curfew, had completed his BOP sentence there, should not have been arrested, and had not seen a judicial officer at Superior Court.  Jane Doe 2 stated that she would contact BOP and look into his claims.

47.     Throughout the next eight weeks, Mr. Jones met with Jane Doe 2 on an approximately weekly basis.  At each of these seven or eight visits, he pleaded with her that he was wrongfully detained.  Each time Jane Doe 2 stated words to the effect that Mr. Jones was being held for "escape" and that she would call BOP or was waiting for BOP to call her.

48.     On information and belief, Jane Doe 2 took no action to actually investigate Mr. Jones's claims.  In the alternative, if Jane Doe 2 diligently attempted to contact BOP, John or Jane Does 16-20 failed in their duty to contact CDF about an inmate apparently held illegally pursuant to their request.

49.     Toward the end of December 2014, Mr. Jones was finally able to receive funds from his family, enabling him to place calls on the expensive inmate calling system.

50.     On January 2, 2014, after being told for weeks by Jane Doe 2 that she had not heard from BOP, and now having funds to make calls himself, Mr. Jones asked Jane Doe 2 to give him the phone number for the BOP so that he could contact them directly.  Jane Doe 2 gave the BOP's contact information to Mr. Jones, who then provided this information to his father, Brian Davis.

51.     The same day, Mr. Davis contacted the BOP using the number provided by Jane Doe 2.  After providing Mr. Jones's inmate number, Mr. Davis was told by the BOP employee that Mr. Jones was being held for "escape from a halfway house."  When Mr. Davis stated that

Mr. Jones had completed his term at Hope Village, the BOP employee gave Mr. Davis the phone number for Hope Village, and said that he should call them to figure out what the issue was.

52.     Mr. Davis then called Hope Village.  After providing Mr. Jones's inmate number, Mr. Davis was told by an employee at Hope Village that her system showed that Mr. Jones had been released on November 3, 2014.  She stated that she would call BOP to "straighten it out."

53.     A few minutes later, the employee at Hope Village called Mr. Davis back and told him that she had spoken with BOP and that Mr. Jones would be released within twenty-four hours.

54.     As a result of these two brief three or four-minute phone calls by Mr. Davis to BOP and Hope Village, Mr. Jones was finally released by CDF on January 2, 2015 after nearly two months of wrongful detention.

55.     The two months that Mr. Jones was wrongly detained coincided with what are traditionally the two most important family holidays—Thanksgiving and Christmas.  This was devastating to him and his family, who had patiently awaited Mr. Jones's return from prison and eagerly anticipated their first Christmas together in five years.  Each day that passed during the holiday season, Mr. Jones and his family suffered under agonizing uncertainty over whether and when they would be able to be reunited.  Mr. Jones's absence was especially painful for his daughters, who asked their mother repeatedly when their father could come home.  Mr. Jones and his family will never be able to recreate the experience of happiness they had long anticipated for their first Thanksgiving and Christmas together; nor will they be able to erase the memory of the anxiety, injustice, and powerlessness they felt instead.

## COUNT I

**42 U.S.C. § 1983 – Unlawful Seizure in Violation of the Fourth Amendment**
**(Against Sheila Adegbie, John Doe 3, and John or Jane Does 16-20)**

56.     Plaintiff realleges and incorporates by reference all preceding allegations.

57.     At all times relevant to this Complaint, Plaintiff had a clearly-established constitutional right under the Fourth Amendment to be free from unlawful seizures.

58.     On November 5, 2014, acting under color of state law as an MPD officer, Defendant John Doe 3 unlawfully seized Mr. Jones without probable cause.

59.     On November 5, 2014, Defendant Sheila Adegbie, in her capacity as a federal official, acted in concert with John Doe 3 by instigating the seizure of Plaintiff without probable cause.

60.     Defendants John or Jane Doe 16-20 acted in concert with John Doe 3 by authorizing District of Columbia police to apprehend Plaintiff without probable cause.

61.     At the time of Plaintiff's seizure, any reasonable officer would have known that a warrant for an escape from a halfway house might no longer be valid when the target of the warrant possesses paperwork indicating an official release from the halfway house.

62.     Any reasonable officer under such circumstances would know that seizing Plaintiff without minimal effort to investigate and verify the legal basis for arrest would violate Plaintiff's right to be free from unreasonable seizure.

63.     As a direct and proximate result of Plaintiff's unlawful seizure, Plaintiff has suffered and continues to suffer damages in an amount to be proven at trial.

64.     Plaintiff is also entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

## COUNT II

**42 U.S.C. § 1983 – Unlawful Search in Violation of the Fourth Amendment
(Against John Does 6-10)**

65.     Plaintiff realleges and incorporates by reference all preceding allegations.

66.     At all times relevant to this Complaint, Plaintiff had a clearly-established constitutional right under the Fourth Amendment to be free from unreasonable searches.

67.     On November 6, 2014, acting under color of state law as CDF correctional officers, John Does 6-10 subjected Plaintiff to an invasive full-body cavity search upon his transfer from Superior Court.

68.      Since Plaintiff had already been subjected to an invasive full-body cavity search on November 5, 2014, and since he was at all times within the custody of CDF or USMS, there was no rational basis to subject him for a second time o such an invasive search.

69.     Since Plaintiff's invalid arrest for "escape" had been "no papered" at Superior Court, John Does 6-10 had no objectively reasonable basis for detaining Plaintiff at all, further underscoring the unconstitutionality of invasively searching his body cavities.

70.     As a direct and proximate result of this unlawful invasive body-cavity search, Plaintiff has suffered and continues to suffer damages in an amount to be proven at trial.

71.     Plaintiff is also entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

## COUNT III

**42 U.S.C. § 1983 – Unlawful Detention in Violation of the Fifth Amendment**
**(Against Jane Doe 2, John or Jane Does 4 & 5, Sheila Adegbie, John or Jane Does 11-15,**
**and John or Jane Does 16-20)**

72.     Plaintiff realleges and incorporates by reference all preceding allegations.

73.     At all times relevant to this Complaint, Plaintiff had a clearly-established constitutional right under the Fifth Amendment to be free from restraints on his liberty without due process of law.

74.     At all times relevant to this Complaint, Defendant Jane Doe 2 acted under color of state law as the case manager responsible for inmates in Northwest Unit 1 of CDF.  As a case manager for detained inmates, including Mr. Jones, Defendant Jane Doe 2 owed a duty of care to Mr. Jones to ensure that he was accurately informed of the reasons for his detention, to ensure that Mr. Jones saw a judicial officer, and to ensure that Mr. Jones was not unlawfully detained at CDF.

75.     At all times relevant to this Complaint, Defendants John or Jane Does 4 & 5 acted under color of state law as legal instrument examiners responsible for processing Mr. Jones at intake and ensuring that there was a valid basis for his detention.  As individuals responsible for reviewing the legal basis for detaining inmates, including Plaintiff, John or Jane Does 3 & 4 owed a duty of care to Plaintiff to ensure that he was not unlawfully detained at CDF.

76.     At all times relevant to this Complaint, Defendant Sheila Adegbie was a federal officer acting in concert with District of Columbia MPD officers and CDF officials to arrest and detain inmates under her supervision.  As an individual responsible for supervising Mr. Jones and providing timely and accurate information and meaningful recommendations to criminal

justice decision-makers with authority over him, Ms. Adegbie owed a duty of care to Mr. Jones to ensure that he was not unlawfully detained at CDF.

77.     At all times relevant to this Complaint, John or Jane Does 11-15 were federal USMS officers working in concert with District of Columbia CDF employees to physically detain and transport inmates, including Plaintiff.

78.     At all times relevant to this Complaint, John or Jane Does 16-20 were federal officers or employees of the BOP working in concert with District of Columbia MPD officers and CDF officials to detain inmates on BOP's behalf.

79.     On November 6, 2014, USMS officers John or Jane Does 11-15, acting in concert with CDF employees, unlawfully deprived Plaintiff of his freedom without due process of law by restraining him in a cell in Superior Court without bringing him before a judicial officer, and, knowing that he had not been presented to a judicial officer, physically transporting him back to CDF in concert with CDF employees.

80.     Any reasonable officer would have known that restraining Mr. Jones and transporting him to CDF without allowing him to see a judicial officer—a right afforded all other returning inmates—violated Plaintiff's clearly-established Fifth Amendment rights.

81.     From November 6, 2014 to January 2, 2014, BOP employees John or Jane Does 15-20, acting in concert with employees and officers of CDF, caused Plaintiff to be unlawfully detained by CDF by invalidly requesting his detention by CDF and/or failing to update prior requests for detention after Plaintiff returned to Hope Village and completed his BOP sentence, despite their duty to do so, and despite knowing that CDF would likely detain Plaintiff pursuant to its requests.

82.     From November 6, 2014 to January 2, 2014, Defendant Sheila Adegbie, acting in

concert with officers and employees of CDF, caused Plaintiff to be unlawfully detained at CDF by requesting his arrest by MPD officers and then failing in her duty to investigate Mr. Jones's claims that he returned to Hope Village and competed his BOP sentence, even after November 29, 2014, when Ms. Adegbie should have expected Mr. Jones to again be preparing to begin supervision with her office.

83.     From November 6, 2014 to January 2, 2014, Defendants John or Jane Doe 4 & 5 caused Plaintiff to be unlawfully detained at CDF by failing to ensure that there was a valid legal instrument for his detention, despite their duty to do so.

84.     On information and belief, John or Jane Does 4 & 5 knew or should have known that when Plaintiff was processed for intake after his return from Superior Court, there was no commitment order from a judicial officer authorizing John or Jane Does 4 & 5 to place him into the custody of CDF.

85.     Since no valid commitment order from a judicial officer was issued after Plaintiff was transported from CDF to Superior Court, no reasonable officer could have believed that detaining Plaintiff after his return from Superior Court would be consistent with his clearly-established Fifth Amendment rights.

86.     From November 6, 2014 to January 2, 2014, Jane Doe 2 unlawfully caused Plaintiff to be restrained in violation of this constitutional right by breaching her duty to ensure there was a valid basis for his detention, despite his multiple requests on a weekly basis for her to investigate his claim.

87.     Since Plaintiff informed Jane Doe 2 on seven or eight occasions on a weekly basis that he had returned to Hope Village, completed his term, and had not seen a judicial officer, Jane Doe 2 could not have reasonably believed that her failure to investigate and report his

claims would not cause Plaintiff's constitutional rights to be violated.

88.     Even if Jane Doe 2, John or Jane Does 4 & 5, Sheila Adegbie, or John or Jane Does 16-20 mistakenly believed that Plaintiff had escaped on October 10, 2014, that would at most mean that he could be detained an additional twenty-four days—the difference between that date and his scheduled release date of November 3, 2014.  Accordingly, even if a reasonable officer could believe that it was legal to detain Plaintiff after he returned from Superior Court without a detention order, no reasonable officer could believe that continuing to detain Plaintiff beyond his 24th day in custody (November 29, 2014) would not violate Plaintiff's constitutional rights.

89.     As a direct and proximate result of Plaintiff's unlawful restraint (i) at Superior Court on November 6, 201 and (ii) at CDF from November 6, 2014 to January 2, 2015, Plaintiff has suffered and continues to suffer damages in an amount to be proven at trial.

90.     Plaintiff is also entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

## COUNT IV

**42 U.S.C. § 1983 – Deliberate Indifference in Violation of the Fifth & Eighth Amendments**
**(Against William Smith and District of Columbia)**

91.     Plaintiff realleges and incorporates by reference all preceding allegations.

92.     At all times relevant to this Complaint, Plaintiff had a clearly-established constitutional right under the Fifth Amendment to be free from restraints on his liberty without due process of law.

93.     In the prison setting, where forethought about the welfare of inmates "is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary

responsibility for his own welfare," "deliberate indifference can rise to a constitutionally shocking level. . . ." *County of Sacramento vs. Lewis*, 523 U.S. 833, 851 (1998).

94.     In two well-publicized lawsuits, the District of Columbia was accused of being deliberately indifferent to the violation of inmates' Fifth Amendment rights by CDF on a massive scale.   *See Barnes, et al. v. District of Columbia.*, 06-0315 (RCL) (D.D.C); *Bynum, et al. v. District of Columbia*, No. 02-0956 (D.D.C.).   The main focus of the *Barnes* and *Bynum* cases involved short periods of overdetention for inmates during the processing of their release, as well as unconstitutional strip-searches of inmates cleared for release.

95.     In submissions by the District of Columbia in the *Barnes* litigation, the District stated that it began to take some steps to address the overdetention problem at issue in *Barnes* and *Bynum*.   Specifically, according to the District, in 2007, the DOC: (i) instituted a new training regime for legal instrument examiners, including 44 hours of "Records Office Overview Training" focused on the release process; (ii) began using sentence-computation software to determine release dates; and (iii) began for the first time to track overdetentions using monthly "discrepancy reports."   In 2008, the DOC instituted a "courthouse release" program, which permits inmates charged with misdemeanors to be released directly from the Superior Court, instead of being transporting them back to CDF, where they would be subjected to post-release strip searches.   In 2009, the DOC (i) modernized its Records Office; (ii) took over more responsibility from the USMS for inmates at Superior Court; and (iii) made changes to the Prisoner Transfer Report.   And in 2010, the District began weekly audits of the Jail and Community Corrections System (JACCS) database.

96.     According to monthly discrepancy reports submitted by the District of Columbia in the *Barnes* litigation, there were 302 overdetentions in 2007, 143 in 2008, 56 in 2009, 85 in

2010, and a pace for 52 overdetentions in 2011 through the end of May.  For purposes of the reports, an "overdetention" occurs when someone is "released after 11:59 p.m. on the day they are ordered released, or alternatively, situations where the end of sentence calculation was computed incorrectly."

97.     The district court in *Barnes* held as a matter of law that the District of Columbia's reforms from 2007 to 2010, along with the significantly downward trend in overdetentions, precluded a finding as matter of law that it was deliberately indifferent to overdetentions occurring between February 2008 and the *Barnes* decision.

98.     However, in its submissions in the *Barnes* litigation, the District of Columbia acknowledged that of the overdetentions that remain, many were caused by mistakes in calculating inmates' sentences by DOC or a federal entity, such as the BOP or USMS.  Unlike the relatively brief overdetentions resulting from routine processing procedures at the heart of *Barnes* and *Bynum*, these overdetentions extended for much longer periods of time and worked a much more extreme hardship on inmates, who were left to suffer for weeks in uncertainty over why they had not been released.

99.     The problem of overdetention due to DOC's reliance on information from BOP and USMS was highlighted by another lawsuit, *Wormley v. United States et al.*, 08-cv-449 (RCL).  The facts in *Wormley* were nearly identical to those in this case.  Like Mr. Jones, Ms. Wormley was briefly absent from her halfway house, resulting in a notice of escape.  That notice of escape, in turn, led to an improperly-filed detainer by USMS, which, in turn, was unquestioningly relied upon by DOC employees.  As a result, Ms. Wormley languished in prison for over five months, despite her near-constant requests for an explanation from her case manager.  Dkt. 1, *Wormley v. United States et al.*, 08-cv-449 (RCL).

100.    Significantly, the *Wormley* litigation involved the kind of lengthy, non-routine overdetentions that were not the focus of *Bynum* and *Barnes*.  The *Wormley* litigation thus put employees of DOC on specific notice of the need to regularly verify the accuracy of interagency detention documents to ensure that inmates are not wrongly detained as a result of unthinking reliance on BOP or USMS documents.  This is particularly true for escape notices generated by private community corrections facilities operating under BOP authority, as occurred in *Wormley* and here.

101.    Defendant William Smith was the Warden of CDF during the period of Ms. Wormley's wrongful overdetention (October 2006 to March 2007).  As Warden, Defendant Smith was responsible for planning, leading, organizing, and controlling 493 sworn uniform personnel in all aspects of custody and control of a Detention Facility.   On information and belief, Defendant Smith was informed of the *Wormley* litigation in the context of his role as Warden of CDF.

102.    Defendant Smith left that position in October 2007 to work in other jurisdictions. Accordingly, although he oversaw many of the problems at issue in *Wormley*, *Bynum*, and *Barnes*, he had no role in the vast majority of the reforms by DOC and CDF described above.

103.    Defendant Smith returned to the position of Warden of CDF in April of 2014, and was the Warden for the duration of Plaintiff's wrongful detention.   At all times relevant to this Complaint, Defendant Smith acted under color of law as the Warden of CDF.

104.    Defendant Smith was personally named and served with a lawsuit filed in Superior Court on November 14, 2014 by Gregory Smith, an inmate held for 23 days at CDF in contravention of a judicial order for his release.  Although he was not the Warden of CDF during the events at issue in *Smith*, the case provided express notice to Defendant Smith just *eleven days*

into Mr. Jones's wrongful detention that lengthy overdetentions were a problem at CDF.  And, like *Wormley*, the *Smith* case involved another non-routine overdetention unrelated to release procedures at issue in *Bynum* and *Barnes*, illustrating the urgent need to train CDF employees on how to identify and stop such lengthy detentions.

105.    Moreover, just *four days* before Mr. Jones was falsely arrested and imprisoned, an order approving a final settlement was entered in the *Wormley* case.  *See* Dkt. 128, *Wormley v. United States et al.*, 08-cv-449 (RCL).  On information and belief, this event was communicated to Defendant Smith as the Warden of CDF, making him aware (if he were not already) of this case of significant non-routine overdetention under his watch.

106.    In light of Defendant Smith's awareness of (i) the ongoing problem of overdetentions due to sentencing miscalculations, especially when they involve reliance on federal agency documents; (ii) the difficulty of independently discovering such problems without inmate input; (iii) the fact that inmates are the best source of information about potential problems in their own procedural and custodial histories; (iv) the troubling allegations of indifference by case managers to inmate claims of overdetention in *Wormley* and *Smith*; (v) the fact that the inmates themselves had to secure their own release in those cases; and (vi) the extreme suffering visited on such inmates due to the extended length of such non-routine detentions, it was unreasonable for Defendant Smith not to take swift and vigorous action to ensure his subordinates discovered and corrected such overdetentions whenever inmates identified them to their case managers.

107.    In particular, Defendant Smith, *at a minimum*, should have (i) trained all case managers and correctional officers on the importance of listening to inmates and immediately and thoroughly investigating and reporting all inmate claims of wrongful detention;

(ii) established a procedure to document such inmate claims and provide accountability to ensure that they were followed up on by case managers; and (ii) reached out to personnel at BOP and USMS to coordinate the swift verification of the custodial status of inmates claiming to be detained wrongfully.

108.    On information and belief, Defendant Smith did not (i) establish an appropriate training regime to ensure that case managers at CDF appropriately reported and investigated inmate claims of lengthy wrongful detention, (ii) establish an accountability regime to document inmate claims and ensure they were followed up on; or (iii) contact BOP and USMS officials to address this problem.

109.    On information and belief, if the District of Columbia's claims regarding the establishment of weekly audits of the JACCS database and monthly overdetention reports are true, Defendant Smith either (i) was on actual notice that Mr. Jones was wrongly detained no later than several weeks before his release; or (ii) did not review such audits and reports despite the seriousness of the suffering visited upon inmates subjected to lengthy non-routine overdetention; or (iii) failed after his return to CDF to ensure that the accountability regimes established after the *Bynum* and *Barnes* litigation were maintained with sufficient rigor to address the overdetention problem.

110.    Defendant Smith's failure to appropriately train and supervise his staff and otherwise take action in the face of actual and constructive notice of the risk of extreme overdetention in non-routine cases, particularly cases involving risks of communication failures between multiple agencies such as BOP, USMS, and private community correction facilities, demonstrated deliberate indifference to Mr. Jones's constitutional right to liberty without restraint.

111.    In light of the foregoing facts, the District of Columbia also had actual or constructive knowledge that lengthy overdetentions due to sentencing miscalculations by DOC or federal agencies would inevitably occur, and that when they did, case managers at CDF were highly likely to violate inmates' constitutional rights by ignoring their pleas to investigate them. Thus, regardless of their progress in reducing overdetentions as a whole, District policymakers had actual or constructive notice that there was a dire need to fix this particular omission in their training program by training employees specifically on how to respond to such inmate allegations, and to ensure accountability for them, and that without fixing that particular omission in their training program, CDF case managers would likely continue to violate inmates' constitutional rights.

112.    As a direct and proximate result of Defendant Smith's and the District of Columbia's deliberate indifference, Plaintiff was deprived of his liberty at CDF from November 6, 2014 to January 2, 2015, and suffered and continues to suffer damages to be proven at trial.

113.    Plaintiff is also entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

## COUNT V

### *Bivens* – Unlawful Seizure in Violation of the Fourth Amendment
### (Against Sheila Adegbie)

114.    Plaintiff realleges and incorporates by reference all preceding allegations.

115.    At all times relevant to this Complaint, Plaintiff had a clearly-established constitutional right under the Fourth Amendment to be free from unlawful seizures.

116.    As a result of the conduct alleged in Count III, *supra*, Defendant Sheila Adegbie caused Plaintiff to be seized in violation of his clearly-established Fourth Amendment rights.

117.    As a direct and proximate result of Plaintiff's unlawful seizure, Plaintiff has suffered and continues to suffer damages in an amount to be proven at trial.

## COUNT VI

### *Bivens* – Denial of Procedural Due Process in Violation of the Fifth Amendment
### (Against John or Jane Does 11-15)

118.    Plaintiff realleges and incorporates by reference all preceding allegations.

119.    Under the Fifth Amendment of the U.S. Constitution, individuals who have been arrested have a clearly-established right to appear before a judicial officer within 48 hours.

120.    On November 6, 2014, Defendants John or Jane Does 11-15, acting as USMS officers, deprived Mr. Jones of this clearly-established right by loading him back onto a van to be transported to CDF despite knowing that he had not appeared before a judicial officer.

121.    As a direct and proximate result of this denial of procedural due process, Plaintiff has suffered and continues to suffer damages in an amount to be proven at trial.

## COUNT VII

### *Bivens* – Denial of Liberty in Violation of the Fifth Amendment
### (Against John or Jane Doe 1, Sheila Adegbie, John or Jane Does 11-15, and
### John or Jane Does 16-20)

122.    Plaintiff realleges and incorporates by reference all preceding allegations.

123.    At all times relevant to this Complaint, Plaintiff had a clearly-established constitutional right under the Fifth Amendment to be free from restraints on his liberty without due process of law.

124.    On November 6, 2014, Defendant John or Jane 1 caused this right to be violated by failing in his or her duty to take all necessary actions to ensure that his or her decision to "no paper" Plaintiff's pending escape charge was communicated to officers and employees of USMS

and CDF responsible for Plaintiff's physical detention.

125.    As alleged in Count III, *supra*, Defendant John or Jane Does 11-15 caused Plaintiff to be unlawfully detained at Superior Court following the "no papering" of his case November 6, 2014, in violation of his clearly-established Fifth Amendment rights..

126.    As alleged in Count III, *supra*, Defendant Sheila Adegbie caused Plaintiff to be unlawfully detained at CDF from November 6, 2014 to January 2, 2015 by, *inter alia*, instigating his detention without probable cause and then failing in her ongoing duty to investigate Plaintiff's case, in violation of his clearly-established Fifth Amendment rights.

127.    As alleged in Count III, *supra*, Defendant John or Jane Does 16-20 caused Plaintiff to be unlawfully detained at CDF from November 6, 2014 to January 2, 2015 by, *inter alia*, unlawfully requesting his detention by CDF and/or failing in their duty to respond to inquiries from CDF concerning Plaintiff, in violation of his clearly-established Fifth Amendment rights.

128.    As a direct and proximate result of this unconstitutional detention, Plaintiff has suffered and continues to suffer damages in an amount to be proven at trial.

### COUNT VIII

***Bivens* – Deliberate Indifference in Violation of the Fifth and Eighth Amendments (Against Sheila Adegbie)**

129.    Plaintiff realleges and incorporates by reference all preceding allegations.

130.    Defendant Adegbie was given actual notice that Mr. Jones had returned to Hope Village and been formally released at the end of his sentence.

131.    Defendant Adegbie was responsible for supervising Mr. Jones and providing criminal justice decision-makers with accurate and timely information about him.

132.    Despite this actual notice, and despite this duty to provide accurate and timely information, Defendant Adegbie arranged for Mr. Jones to be arrested.

133.    After having Mr. Jones arrested, Defendant Adegbie was deliberately indifferent to the risk that his Fifth Amendment rights would be violated by criminal justice and custodial decision-makers that she knew would have control over Mr. Jones and that she knew would likely have incorrect information about his escape from Hope Village.

134.    As a direct and proximate result of this deliberate indifference, Plaintiff has suffered and continues to suffer damages in an amount to be proven at trial.

## COUNT IX

**False Imprisonment under Common Law of the District of Columbia**
**(Against Jane Doe 2, John Doe 3, John or Jane Does 4 & 5, and John or Jane Does 11-15)**

1.    Plaintiff realleges and incorporates by reference all preceding allegations.

2.    On November 5, 2014, Defendant John Doe 3 unlawfully deprived Plaintiff of his liberty by restraining him against his will without probable cause for his arrest.

3.    From November 6, 2014 to January 2, 2014, Defendant Jane Doe 2 caused Plaintiff to be unlawfully restrained against his will by failing in her duty to investigate Plaintiff's repeated insistence that he had returned to Hope Village, had not seen a judicial officer, and was wrongfully detained.

4.    From November 6, 2014 to January 2, 2014, Defendants John or Jane Doe 4 & 5 caused Plaintiff to be unlawfully deprived of his liberty by failing to ensure that there was a valid legal instrument for his detention, despite their duty to do so.

5.    From November 6, 2014 to January 2, 2014, John or Jane Does 11-15 falsely imprisoned Mr. Jones by restraining him against his will at CDF without lawful authority.

6.      At all times relevant to this Complaint, Defendants Jane Doe 2, John Doe 3, John or Jane Does 4 & 5, and John or Jane Does 11-15 were employed by Defendant District of Columbia and were acting within the scope of their employment.

7.      As a direct and proximate result of the Defendants' actions, Mr. Jones suffered and continues to suffer damages in an amount to be proven at trial.

## COUNT X

### Negligence under Common Law of the District of Columbia
### (Against District of Columbia, Jane Doe 2, and John or Jane Does 4 & 5)

8.      Plaintiff realleges and incorporates by reference all preceding allegations.

9.      Defendant Jane Doe 2 was expressly put on notice by Mr. Jones that he did not escape from Hope Village and had not seen a judicial officer, and thus that his detention at CDF was unlawful.

10.      As a case manager for detained inmates, including Mr. Jones, Defendant Jane Doe 2 owed a duty of care to Mr. Jones to ensure that he was accurately informed of the reasons for her detention, to ensure that Mr. Jones saw a judicial officer, and to ensure that Mr. Jones was not unlawfully detained at CDF.

11.      As individuals responsible for reviewing the legal basis for detaining inmates, including Mr. Jones, John or Jane Does 4 & 5 owed a duty of care to Mr. Jones to ensure that Mr. Jones was not unlawfully detained at CDF.

12.      These duties of care arose out of the special relationship between the Defendants and Mr. Jones, since Mr. Jones was physically within the Defendants' custody and care.

13.      These duties of care further arose out of the national standard of care for detention facilities and the well-publicized problems of wrongful detention reflected in multiple lawsuits

against the District of Columbia, which resulted in binding settlements requiring new policies and procedures directed toward the prevention of wrongful detention at CDF.

14.     Defendants Jane Doe 2 and John or Jane Does 4 & 5 breached their duty of care to Mr. Jones by failing to ensure that he was accurately informed of the reasons for his detention, and by failing to ensure that Mr. Jones was not unlawfully detained at CTF.

15.     Defendant Jane Doe 2 further breached her duty of care to Mr. Jones by failing to accurately and timely notify any and all superiors at CDF that Mr. Jones claimed to be, and indeed was, unlawfully detained.

16.     At all times relevant to this Complaint, Defendants Jane Doe 2 and John Does 3 & 4 were employed by Defendant District of Columbia and were acting within the scope of their employment.

17.     As a direct and proximate result of the Defendants' actions, Mr. Jones suffered and continues to suffer damages in an amount to be proven at trial.

## COUNT XI

### Negligent Supervision under Common Law of the District of Columbia
### (Against William Smith and District of Columbia)

18.     Plaintiff realleges and incorporates by reference all preceding allegations.

19.     Defendants Jane Doe 2 and John or Jane Doe 3 & 4 behaved in an incompetent manner by failing to conduct the most basic investigations into the legal basis for Plaintiff's detention and Plaintiff's claims of wrongful detention.

20.     On information and belief, Defendant Smith knew or should have known that his subordinates, including Jane Doe 2 and John or Jane Doe 3 & 4, were failing to correct lengthy cases of overdetention due to the weekly auditing and monthly reporting requirements

implemented in the aftermath of the *Barnes* and *Bynum* cases.

21.     In the alternative, Defendant Smith negligently failed to adequately review these reports or negligently failed to train and supervise the staff responsible for rigorously implementing them.

22.     As a direct and proximate result of Defendant Smith's negligent supervision of Defendants Jane Doe 2 and Jane Doe 3 & 4, Mr. Jones was wrongly detained for two months.

23.     At all times relevant to this Complaint, Defendant Smith was employed by Defendant District of Columbia and was acting within the scope of his employment.

24.     As a direct and proximate result of the Defendants' actions, Mr. Jones suffered and continues to suffer damages in an amount to be proven at trial.

<u>**COUNT XII**</u>

**Negligence under Common Law of the District of Columbia**
**(Against Hope Village)**

25.     Plaintiff realleges and incorporates by reference all preceding allegations.

26.     At all times relevant to this Complaint, Defendant Hope Village operated a community corrections facility under contract with the Federal Bureau of Prisons.

27.     Defendant Hope Village owed Mr. Jones a duty of care due to its special relationship with Mr. Jones as the facility exercising legal control and custody over him.

28.     Having undertaken to issue an escape notice informing multiple agencies that Mr. Jones had "escaped" from Hope Village, Defendant Hope Village had special a duty of care toward Mr. Jones to ensure that all interested agencies affected by its notice were properly informed of his return to Hope Village, and that no warrants for his arrest existed that would subject him to false imprisonment.

29.     Defendant Hope Village's duty of care included abiding by rules and directives set forth in their contract with the Federal Bureau of Prisons, which are designed to ensure that the inmates are properly tracked by the multiple entities and agencies with responsibility for ensuring the safety of the public.

30.     Defendant Hope Village breached its duty of care by failing to comply with all BOP rules and directives concerning escapes and failing to ensure that all interested and affected agencies were accurately and timely informed of Mr. Jones's return to Hope Village and successful completion of his term of custody on November 3, 2015.

31.     It is a foreseeable consequence of failing to accurately and timely report on the whereabouts and custodial status of inmates that inmates may be subjected to false arrest and imprisonment by agencies or entities that believe the inmate has escaped from custody.

32.     As a direct and proximate result of the Defendant's actions, Mr. Jones suffered and continues to suffer damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and a judgment against Defendants:

Ordering Defendants to pay, jointly and severally, $1,500,000 in compensatory damages to Mr. Jones;

Ordering the District of Columbia, its agencies and its named and unnamed officers and employees; Hope Village; and all named and unnamed federal officers to pay, jointly and severally, $1,500,000 in punitive damages to Mr. Jones;

Awarding Plaintiff costs, attorneys' fees, and other disbursements for this action; and

Granting Plaintiff such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury as to all issues.

January 4, 2016                                    Respectfully Submitted:


                                                   /s/  Matthew J. Peed_____
                                                   Matthew J. Peed (D.C. Bar No. 503328)

                                                   CLINTON BROOK & PEED
                                                   1455 Pennsylvania Ave. N.W., Suite 400
                                                   Washington, DC 20004
                                                   (202) 618-1628 (tel)
                                                   (202) 204-6320 (fax)

                                                   *Attorney for Plaintiff Andrew Jones*