## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ANDREW JONES, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | **No. 16-cv-0007 (APM)** |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, et al. | ) | |
| | ) | |
| *Defendants*. | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiff Andrew Jones, by and through undersigned counsel, respectfully submits the following points and authorities in opposition to the motion to dismiss ("Mot.") filed by Defendants District of Columbia, William Smith, Stephen Stanford, Annette Blair-Summers, and Tia Gaines ("District Defendants"):

## INTRODUCTION

The District Defendants' motion to dismiss targets a version of the complaint that exists only in their minds. Ignoring the actual allegations in the Amended Complaint ("AC"), the District Defendants create an alternate universe in which Mr. Jones was arrested pursuant to a "facially valid" warrant, Mot. at 4, 6, 7, 8, 9, 10, 12, 13, 15, 16, 18, 20, detained at D.C.'s Central Detention Facility (CDF) based on that warrant, *id*. at 9-10, and not "overdetained," *id*. at 17. In this fantasy, the only indication that something was amiss was Mr. Jones's "protestations of innocence." *Id*. at 9. As one court colorfully described a similar diversion attempt, this is "the legal equivalent of Obi-Wan Kenobi's 'These aren't the droids you're looking for.'" *United States v. Stapleton*, Crim. No. 12-11 (ART), 2013 WL 3967951, at *8 (E.D. Ky. July 31, 2013) (quoting Star Wars Episode IV: A New Hope (Lucasfilm 1977)).

1

Contrary to the motion's constant mantra, Mr. Jones was not arrested pursuant to a "facially valid warrant." As alleged in the Amended Complaint, Mr. Jones was arrested based on a "hit" in the National Crime Information Center (NCIC) database. AC ¶ 41. Unlike a judicially-issued warrant, the text of the NCIC report expressly cautioned *on its face* that the validity of the three-week old underlying warrant *must* be independently verified with the issuing agency. AC ¶ 42. Defendant Stanford's failure to do so was objectively unreasonable, especially since Mr. Jones showed him two-day old government-issued paperwork that was *facially-incompatible* with the information in the NCIC "hit." AC ¶ 41.

Nor was Mr. Jones detained for two months pursuant to any warrant, whether facially-valid or otherwise. As alleged in the Amended Complaint, District officials knew Mr. Jones had no pending charges after he returned from D.C. Superior Court on November 6, 2016, but held him *anyway* because they assumed—without any verification—that time remained on his Bureau of Prison (BOP) sentence. AC ¶¶ 51-54. Having been held beyond his release date due to the District's failure to calculate when that date was, Mr. Jones was in the same position as all victims of overdetention whose release dates were incorrectly calculated, or not calculated at all.

Finally, Mr. Jones did not claim to be "innocent" of escape; rather, he repeatedly told the District Defendants—from Defendant Stanford, who arrested him, to Defendant Blair-Summers, who processed him, to Defendant Gaines, who managed his case—that he had returned to his halfway house and *completed* his BOP sentence. AC ¶¶ 38, 41, 62, 65. That was an easily verifiable administrative fact accessible from the Defendants' own computers, not a "protestation of innocence." AC ¶ 39. The District Defendants' repeated failure to take minimal steps to verify this fact directly implicating the lawfulness of their detention was objectively unreasonable, and caused them to deprive Mr. Jones of his fundamental constitutional rights.

Since the District's arguments are premised almost exclusively on these mischaracterizations of the Amended Complaint, very little legal analysis is required to dispense with Defendants' motion.  In broad strokes, the parties agree that police officers and jailers are not usually required to look behind facially-valid judicial warrants or detention orders to ensure they are based on probable cause, or investigate claims of innocence by persons validly arrested or detained.   But neither can they close their eyes and rely on facially insufficient or inconsistent documents, especially in the presence of easily-verifiable evidence that there is no lawful basis for detention.   Such officers, at a minimum, are "plainly incompetent," and are not immune from having to answer for their conduct in a civil proceeding such as this one.   Since the Amended Complaint alleges such facts here, the Defendants' attempt at a Jedi mind-trick on the Court cannot get off the ground.

## STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a complaint."   *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted). While detailed factual allegations are not necessary, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).   A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id*.   In assessing whether a claim is plausible, the court must accept as true all of the allegations contained in a complaint and

construe the complaint liberally in the plaintiff's favor, granting the plaintiff the benefit of all reasonable inferences. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). The court does not "accept legal conclusions cast in the form of factual allegations," however. *Id.*

## ARGUMENT

### I.   Officer Stanford Did Not Reasonably Rely on a Facially-Valid Warrant and Is Not Entitled to Qualified Immunity

Defendant Stanford asserts that he relied on a facially-valid warrant when arresting Mr. Jones, and that he is therefore categorically immune from civil liability.  He is wrong on both counts.  As alleged in the Amended Complaint, Defendant Stanford did not rely on a facially-valid warrant when he arrested Mr. Jones, he relied on a "hit" in a law enforcement database that *expressly* required confirmation on its *face*.  And even if he had, the Supreme Court has made it abundantly clear that officers that act unreasonably are subject to civil liability under § 1983 even when they act pursuant to a valid, judicially-issued arrest warrant.  Under this clearly-established law, Defendant Stanford is liable for his careless disregard of his responsibilities in the face of facially-inconsistent release documents and express instructions in the NCIC database to verify the validity of the warrant against Mr. Jones with the issuing agency prior to arrest.

### A.   Under Clearly-Established Law, Probable Cause Requires a Consideration of All of the Circumstances, Even If There is a "Facially Valid Warrant"

An official's entitlement to protection under the doctrine of qualified immunity "generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244-45 (2012) (citations omitted).  The clearly-established legal rules at the time of Mr. Jones's arrest required an officer to assess the existence of probable cause in light of the "totality of the circumstances":

> For probable cause to exist, . . . an arrest must be objectively reasonable based on the *totality of the circumstances*. This standard is met when the *facts and circumstances* within the officer's knowledge, of which he or she has *reasonably trustworthy information*, would cause a prudent person to believe, *under the circumstances* shown, that the suspect has committed, is committing, or is about to commit an offense.

*Bailey v. United States Marshal Serv.*, 584 F. Supp. 2d 128, 132 (D.D.C. 2008) (emphasis added).

*See also Wesby v. District of Columbia*, 765 F.3d 13, 19 (D.C. Cir. 2014) ("An arrest is supported by probable cause if, 'at the moment the arrest was made, . . . the facts and circumstances within [the arresting officers] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that the suspect has committed or is committing a crime.") (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)) (alterations in original); *United States v. Washington*, 670 F.3d 1321, 1324 (D.C. Cir. 2012) (same).

In his motion, Officer Stanford attempts to replace this fact-specific inquiry with a categorical rule in which reliance on a "facially valid warrant"—alone—is sufficient to cloak him with qualified immunity regardless of the circumstances. *See* Mot. at 6. That is not the law. Rather, the Supreme Court has expressly "reject[ed] the notion that approval of a warrant by a neutral magistrate automatically establishes qualified immunity, and require[ed] instead that the officer exercise his own 'reasonable professional judgment.'" *Wesby*, 765 F.3d at 28 (quoting *Malley v. Briggs*, 475 U.S. 335, 345–46 (1986)). Accordingly, reliance on a facially-valid, judicially-issued warrant is merely one factor in favor of qualified immunity, and is not categorically dispositive:

> Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in "objective good faith." *United States v. Leon*, 468 U.S. 897, 922-23, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Nonetheless, under our precedents, *the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness.* Rather, we have recognized an exception allowing suit

when "it is obvious that no reasonably competent officer would have concluded
that a warrant should issue." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

*Messerschmidt*, 132 S. Ct. at 1245 (emphasis added).  *See also Berg v. Cty. of Allegheny*, 219
F.3d 261, 273 (3d Cir. 2000) ("[A]n apparently valid warrant does not render an officer immune
from suit if his reliance on it is unreasonable in light of the relevant circumstances.  Such
circumstances include, but are not limited to, other information that the officer possesses or to
which he has reasonable access, and whether failing to make an immediate arrest creates a public
threat or danger of flight.") (citing *Malley*, 475 U.S. at 345).

### B.   Under the Totality of the Circumstances, Including the Instructions on the Face of the NCIC Bulletin and the Facially-Inconsistent Release Papers, Officer Stanford's Arrest of Mr. Jones was Unreasonable

Completely ignoring the allegations in the Amended Complaint, the District Defendants
repeatedly assert that Officer Stanford arrested Mr. Jones pursuant to a "facially valid warrant."[1]
In fact, the Amended Complaint does *not* allege that Mr. Jones was arrested pursuant to a
"facially valid" judicial warrant; it alleges that Officer Stanford arrested Mr. Jones after reviewing
a three-week old *report* in the NCIC database stating that three weeks earlier, an *administrative*
warrant had been issued by USMS requesting Mr. Jones's apprehension as a "halfway house
walkway."  AC ¶¶ 37-40.

---

[1] In defendants' highly misleading summary of the Complaint:

> USMS issued a warrant . . . . [Mr. Jones] was informed . . . that he would be
> arrested on the outstanding warrant . . . . The Supervision Assistant called the
> Metropolitan Police Department (MPD) to execute the warrant.  Plaintiff was
> arrested….

Mot. at 2-3 (citations omitted).

Unlike a judicial warrant from a neutral magistrate,[2] that NCIC report stated o*n its face* that officers were required to immediately confirm the ongoing validity of the warrant with the originating agency prior to making any arrests, and included the phone number for the USMS as the originating agency.  AC ¶ 42.  According to the NCIC manual, this language on the face of the report "'is a reminder to the inquiring agency that it *must* immediately check with the agency(s) that entered the wanted person record(s) to verify the identity of the individual, *determine if there has been any change in the status of the warrant*, and, if applicable, obtain extradition details.'"  *Id.* (quoting NCIC manual) (emphasis added); *see also id.* (stating that an NCIC report "'is only *one* element comprising sufficient legal grounds for probable cause to arrest,'" and that "'[c]orrect NCIC 2000 procedure *requires* the agency which placed the record in file be contacted by the inquiring agency to confirm that the data are accurate and up-to-date'") (quoting NCIC manual) (emphasis added).  Fulfilling this facial requirement—which has no analogue in a judicial warrant from a neutral magistrate—was indispensable to assuring the lawfulness of Mr. Jones's arrest.  Accordingly, based on the "face" of the NCIC bulletin *alone*, Officer Stanford's arrest of Mr. Jones was unreasonable and violated clearly-established law.

---

[2]  The role of a magistrate cannot be understated.  Officers are entitled to rely on magistrate-issued warrants because "the detached scrutiny of a neutral magistrate . . . is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer." *Leon*, 468 U.S. at 913-14 (citations omitted).  *See Messerschmidt*, 132 S.Ct. at 1245 ("[T]he fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or . . . in 'objective good faith.'") (citation omitted).  While the deference given to a magistrate is not "boundless"—the law still requires a "magistrate's probable cause determination [to] reflect a[ ]proper analysis of the totality of the circumstances," *Leon*, 468 U.S. at 914-15—the administrative warrant in this case was *never* subjected to "the detached scrutiny of a neutral magistrate," and thus deserved no such deference.  *See Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 565-66 (1971) (noting that the Supreme Court consistently refused to subject officers' probable cause determinations to "less stringent standards" than a magistrate's determinations, because it "would discourage resort to the procedures for obtaining a [judicial] warrant.").

Moreover, Officer Stanford's decision to ignore the instructions of the NCIC report and arrest Mr. Jones is even more troubling in light of the surrounding circumstances.  For example, Mr. Jones self-reported to CSOSA on November 5, 2014, and presented no emergency requiring immediate action.  *Cf. Romero v. Fay*, 45 F.3d 1472, 1474 (10th Cir. 1995) (citing need to arrest a murder suspect four hours after the shooting).  Mr. Jones showed Officer Stanford a two-day-old government-issued document, "printed from a secured CSOSA network site beginning with the url: 'https://smart.csosa.gov," that was "facially incompatible with the 'HWH WALK AWAY' description" in the NCIC report.  AC ¶ 41.  And Officer Stanford and Mr. Jones met in CSOSA offices, which had easy electronic access to a number of government resources that would definitely have established the invalidity of the three-week-old warrant.  Nevertheless, "even though Mr. Jones had peaceably self-reported to the CSOSA office and presented no emergency, the MPD officers did not take even minimal steps to call the BOP, Hope Village, or USMS to investigate the facial discrepancy between the [three-week old] NCIC report and the [two-day old official CSOSA] release paperwork printed by Hope Village and accessible on own CSOSA's [sic] system." *Id*.

In a highly analogous case, the Third Circuit rejected a Pennsylvania constable's assertion of qualified immunity for executing even a facially-valid parole warrant where the plaintiff, like Mr. Jones here, "offered to produce release documents proving that he was no longer on parole." *Berg*, 219 F.3d at 267-68.  The constable "refused to look at the release documents," but did review the plaintiff's driver's license, which "confirm[ed] that Berg was no longer on parole."  *Id*. Emphasizing that "an apparently valid warrant does not render an officer immune from suit if his reliance on it is unreasonable in light of the relevant circumstances," *id*. (citing *Malley*, 475 U.S. at 345), the Third Circuit found that the plaintiff could prove that the constable had acted

unreasonably under the totality of the circumstances, even notwithstanding the facially valid warrant.  That holding applies here in spades, where Officer Stanford did not rely on a facially valid warrant and had every reason to believe the unverified three-week old NCIC report was no longer valid.

None of the cases cited by the District Defendants undermine this conclusion. Citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987), the District Defendants state that arresting someone pursuant to a "facially valid warrant . . . plainly 'could reasonably have been thought consistent' with the law at the time." Mot. at 6.  But that case stood for the proposition that qualified immunity applies to law enforcement officials who conduct a *warrantless* search when they "reasonably but mistakenly conclude that probable cause [or exigent circumstances are] present." *Anderson*, 483 U.S. at 641.  As with all such cases—and directly contrary to the District Defendants' position—that determination of whether qualified immunity applies "will often require examination of the information possessed by the searching officials." *Id.*

Next, District Defendants argue that absent "facts to dispute the facial validity of the warrant," Mr. Jones cannot "state[] a claim for violation of a constitutional right." Mot. at 6-7 (citing *McKoy v. Phelps*, No. 95-5193, 1996 WL 393104, at *1 (D.C. Cir. June 24, 1996); *Bailey*, 584 F. Supp. 2d at 133; *Weakes v. FBI-MPD Safe Streets Task Force*, No. Civ. A 05-0595 (ESH), 2006 WL 212141, at *9 (D.D.C. Jan. 27, 2006)).  None of the cited cases support that sweeping claim, which is inconsistent with the Supreme Court's clear statement in *Messerschmidt* that "the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness."  132 S. Ct. at 1245.  In *Bailey*, for example, the court merely rejected the somewhat absurd notion that U.S. Marshals were not the "proper officials" to take custody of the plaintiff under a concededly valid warrant.

9

584 F. Supp. 2d at 131, 133.  In *Weakes*, the plaintiff's only argument was that a handwritten note reflecting the same address typed in other places on the warrant rendered it facially invalid—no other circumstances were alleged to undermine the legality of his arrest.  2006 WL 212141, at *3-4.  And in *McKoy*, the court merely acknowledged in a summary order that as a general matter, officers can rely on NCIC bulletins, 1996 WL 393104, at *1.  Here, Officer Stanford did not rely on the NCIC bulletin, he *ignored* the very instructions in the bulletin that no arrest should be made without verifying that the report was up to date.

The District Defendants go on to state that the Supreme Court "explicitly rejected" the notion that arresting officers *ever* have a duty "to investigate claims of innocence prior to arrest" after a warrant has been issued.  Mot. at 7-8 (citing *Baker v. McCollan*, 443 U.S. 137, 145-46 (1979); *Scott v. District of Columbia*, 493 A.2d 319, 322 (D.C. 1985); *Fettes v. Hendershot*, 375 Fed. Appx. 528, 532 (6th Cir. 2010); *Romero v. Fay*, 45 F.3d 1472, 1480 (10th Cir. 1995); *Hawke v. Livesay*, No. CIV.A. 4:11-139-RBH, 2011 WL 1466362, at *2 (D.S.C. Apr. 6, 2011), *report and recommendation adopted*, No. 4:11-CV-00139-RBH, 2011 WL 1465526 (D.S.C. Apr. 15, 2011)).  But the only Supreme Court case they cite for this proposition, *Baker*, did not even involve a challenge to the reasonableness of an arrest: the "claim was based solely on Sheriff Baker's actions *after* [plaintiff] was incarcerated."  *Baker*, 443 U.S. at 143 (emphasis added). Under the circumstances of that case, the Court noted that a three-day detention was not too long, but "mere detention pursuant to a valid warrant but in the face of repeated protests of innocence *will* after the lapse of a certain amount of time deprive the accused of 'liberty . . . without due process of law.'"  *Id.* at 145.  The note in *dicta* that a "sheriff executing an arrest warrant is [not] required by the Constitution to investigate independently *every* claim of innocence," *id.* at 145-46, clearly does not mean that an officer executing a warrant is absolved from investigating *any* facts

undermining probable cause.  In any event, the need to investigate claims of innocence after an arrest warrant has been issued by a neutral magistrate is categorically different than the need to consider the "totality of the circumstances" where no judicial officer has ever applied "the detached scrutiny of a neutral magistrate" to an administrative warrant reflecting "the hurried judgment of a law enforcement officer."  *Leon*, 468 U.S. at 913-14 (citations omitted).

In sum, the circumstances of Mr. Jones's arrest—where Officer Stanford ignored information already in his knowledge, against the express instructions on the face of the putative arrest document, and in contradiction to more recent government documents—are light years apart from those presented in the other cases on which the defendants rely.  Clearly, where a valid judicial warrant has been issued by a judge or a magistrate, a police officer is on solid footing in executing it even in the face of the arrestee's protestations of innocence, since the probable cause determination has already been made by "the detached scrutiny of a neutral magistrate."  *Id.*  By contrast, no neutral magistrate ever issued an arrest warrant against Mr. Jones, and the NCIC report of a *possible* administrative warrant against him expressly indicated that it required verification—a verification that was manifestly needed in light of facially-inconsistent, government-issued release paperwork issued three weeks after the putative warrant.  No case proffered by the Defendants comes close to reflecting or justifying such rank unreasonableness and incompetence by an arresting officer.

## II.   Plaintiff's Detention at CDF Was Not Based on a "Facially Valid Warrant" And Was Objectively Unreasonable

The detaining defendants employed at D.C.'s Central Detention Facility (CDF)—Smith, Gaines, and Blair-Summers—have even less grounds to assert qualified immunity than Defendant Stanford.  The Defendants' motion is premised entirely on their supposed reliance on the "facially valid" warrant issued by the USMS.  They misconstrue the Amended Complaint as alleging "that

case manager Tia Gaines and legal instrument examiner Annette Blair-Summers violated his due process rights because they should have known or discovered that plaintiff was innocent of the charge for which he was being held." Mot. at 9. They then assert that "like an arrest under a facially valid warrant, a detention under a facially valid warrant is not unconstitutional, even where the arrestee correctly declares his innocence." *Id.*

But as alleged in the Amended Complaint, after Mr. Jones returned to CDF from Superior Court on November 6, 2014, he was no longer held pursuant to any such "warrant." AC ¶ 52. On the contrary, USMS informed CDF officials that Mr. Jones had been cleared of all charges and was simply awaiting designation to a new BOP facility to serve the remainder of his time—time he had already served. AC ¶ 54. Taking Defendants' motion at face value, Defendants claim that it was objectively reasonable for CDF employees to imprison Mr. Jones for nearly two months based on an arrest warrant *after* they were expressly told that he had been cleared of the charge and was not going to be presented to a judicial officer. If that is what Defendants actually believed, they were clearly "plainly incompetent." The Amended Complaint is actually more charitable, and merely alleges that the Defendants held Mr. Jones because they unreasonably assumed without verification that he owed some period of time on his BOP sentence—a fact that, if true, *would* have authorized his detention. AC ¶ 54. As described in the Amended Complaint, Defendants' actual incompetence was reflected in their utter failure to verify or calculate Mr. Jones's remaining time—information that was readily at their fingertips, and that was their *job* to verify—despite his constant pleas of being wrongfully detained. AC ¶ 67.

Since Mr. Jones's two-month detention was not actually based on facially-valid detention documents or other lawful authority, Defendants' reliance on cases discussing the failure to investigate "claims of innocence" is once again simply a red herring. Mr. Jones did not protest

his "innocence" of some charge for which he was being validly held while waiting for the slow wheels of justice to grind his case forward. There was *no case*, and Defendants *knew* there was no case. There was thus no "guilt" or "innocence" that Defendants Gains and Blair-Summers needed to "investigate," nor was there a need to determine whether or not the "warrant" was "inaccurate." Mot. at 10. What the Defendants needed to do was determine whether they had the lawful authority to detain Mr. Jones after he returned from Superior Court *at all*, and, if so, for *how long*. Had they attempted to answer those basic administrative questions—which, again, is their fundamental job description—they would have immediately learned that they had no such authority after Mr. Jones completed his BOP sentence on November 3, 2014. Their failure to do so reflected gross incompetence and deliberate indifference to Mr. Jones's Fifth Amendment rights.[3]

## III.   Neither Officer Stanford nor the District of Columbia Enjoy Qualified Immunity for the Invasive Searches into Mr. Jones's Body Cavities

Mr. Jones was subjected to two humiliating and invasive searches into his genitals and anus within the span of twenty-four hours. The first occurred on November 5, 2014, after Mr. Jones was arrested without probable cause by Officer Stanford and processed into the D.C. Department of Corrections (DOC) Central Cell Block. AC ¶ 46. The second occurred a day later, after he returned from D.C.'s Superior Court and was processed into the general population of CDF. *Id.* at 60. At the time of the second search, Mr. Jones had returned from Superior Court after being in the continuous custody of DOC and USMS officers. *Id.* There were no charges

---

[3] Even if the complaint *did* allege mere protestations of innocence, Defendants would not be entitled to qualified immunity. While the Supreme Court has held that failure to investigate such claims after a valid arrest was not unreasonable over a three-day period, the "mere detention pursuant to a valid warrant but in the face of repeated protests of innocence *will* after the lapse of a certain amount of time deprive the accused of 'liberty . . . without due process of law.'" *Baker*, 443 U.S. at 145.

against him, no time remaining on his sentence, and no judicial orders authorizing further detention by CDF. *Id.* at 62.

The District Defendants do not contest that these humiliating searches reflected District of Columbia policies, or that those searches and policies were unconstitutional. Rather, their *only* contention regarding Count II is that the searches were protected by qualified immunity under D.C. Circuit precedent. Mot. at 10-12 (citing *Bame v. Dillard*, 637 F.3d 380 (D.C. Cir. 2011). But it is well-settled that "[m]unicipalities do not enjoy…qualified immunity from § 1983 suits." *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 163 (1993) (citations omitted). Thus, the District Defendants' argument regarding Count II has absolutely no applicability to the District of Columbia. In any event, *Bame* only addressed the existence of qualified immunity for searches of *lawfully*-detained inmates. Since Mr. Jones was neither lawfully arrested, nor lawfully detained after his return to jail from Superior Court, *Bame* has no bearing on his claims. And even if it did apply, the District Defendants completely ignore the Supreme Court's more recent decision on strip-searches in 2012. *See Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 132 S. Ct. 1510 (2012). In light of the reservations in that decision, the District cannot escape liability for an unconstitutional policy subjecting individuals in segregated facilities to strip searches without individualized suspicion—much less wrongfully-detained individuals such as Mr. Jones.

### A. Mr. Jones's Unlawful Arrest and Detention Made His Invasive Searches Unreasonable Under Any Circumstances

As alleged in the Amended Complaint, Mr. Jones was unreasonably arrested without lawful authority or probable cause by Officer Stanford, against the express instructions of the NCIC manual and the "hit" in the NCIC database. AC ¶ 42-43. Since Mr. Jones's initial seizure was unlawful under the Fourth Amendment, there was no valid reason to detain him in DOC's

Central Cell Block, and thus no valid reason to subject him to a humiliating body-cavity search prior to placing him in the Central Cell Block.  Officer Stanford thus cannot assert qualified immunity for these consequences of his arrest, any more than he can assert qualified immunity for the arrest itself.  Nor is it true, as Defendants assert, that Officer Stanford cannot be held liable for causing an illegal search he did not conduct.  Mot. at 12.  As alleged in the Amended Complaint, "Officer Stanford knew that by arresting Mr. Jones without probable cause, he was initiating a process that would *inevitably* result in Mr. Jones being subjected to invasive body-cavity searches by DOC personnel, yet did nothing following Mr. Jones's arrest to further investigate the lawfulness of his arrest."  AC ¶ 90 (emphasis added).  That is enough to establish liability under § 1983.  *See Malley*, 475 U.S. at 344 n.7 (stating that "§ 1983 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions") (citation omitted).

Similarly, after Mr. Jones returned from Superior Court without any charges, there was no valid reason to continue to detain him at CDF, and thus, again, no valid reason to subject him a second time to an invasive body-cavity search.  As a wrongfully-seized citizen, Mr. Jones was in the same position as the plaintiffs in *Barnes*, who were subjected to strip-searches after being unnecessarily returned to CDF from Superior Court at the conclusion of their cases.  *See Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 287-89 (D.D.C. 2011) (strip searches of inmates "solely due to . . . [the District's] unfortunate choice to bring them back" to CDF were "particularly suspect given that they are happening to persons who are no longer prisoners in the eyes of the law . . . and who are entitled to a restoration of the rights they enjoyed prior to their imprisonment").  The District of Columbia is thus liable for the second search, since its policies caused the invasive search of Mr. Jones's body cavities prior to any determination of whether he

should have been detained at CDF in the first place.  By failing to determine whether inmates may lawfully be detained *before* subjecting them to humiliating searches, the District cannot escape responsibility when unlawfully detained individuals are subjected to those searches.

**B.    Even If Mr. Jones Had Been *Lawfully* Arrested, the Strip Searches Would Still Have Been Unconstitutional**

Contrary to the District Defendants' claims, *Bame* does not "control" the constitutionality of universal strip searches.  Mot. at 12.  Indeed, *Bame* did not even address the constitutionality of strip-searches *vel non*, but merely held that the law was not "clearly established" in 2002 in light of a split in the circuits on the issue.  One year after *Bame*, the Supreme Court addressed that very circuit split in *Florence*, 132 S. Ct. 1510.  Although the Court affirmed the constitutionality of the strip-search in *Florence*, two of the five justices in the majority joined the Court's opinion only on the express condition that it was limited to "arrestees *who are committed to the general population of a jail*," *id*. at 1524 (Alito, J.) (emphasis in original), while four justices stated in dissent that strip searches are *never* constitutional in the absence of individualized reasonable suspicion.  Accordingly, after *Florence*, a majority of the Supreme Court has indicated that it is unconstitutional to universally strip-search arrestees who are, or reasonably could be, segregated from the general population of a jail.

Both searches of Mr. Jones fail this implicit holding of *Florence*.  When Mr. Jones was forced to expose his naked body and body cavities to officers on November 5, 2014, he was an arrestee destined for the DOC's Central Cell Block, a unit segregated from the general population of CDF.  AC ¶ 46.  There was thus no justifiable reason to subject Mr. Jones to such a "humiliating and deeply offensive" search, 132 S. Ct. at 1524 (Alito, J.), since he "could be [and was] held in available facilities apart from the general population, *id*. (Alito, J.).  And when he was subjected to the *second* such humiliating search within 24 hours, he had never left the

custody of DOC or USMS officers—not even to be arraigned before a judicial officer.  While such a search would have been constitutional under *Florence* in the first instance (as a search before admission to the general population of CDF), Mr. Jones had already satisfied the security concerns underlying the *Florence* majority through the *first* search.  Accordingly, even if there were a lawful basis for Mr. Jones's arrest and subsequent processing into CDF—and there was not—the District of Columbia's policies of (i) routinely searching inmates segregated from the general population of CDF, and (ii) routinely searching inmates a *second time* within 24 hours, without any break in their custody or contact with unsearched detainees, violate the Fourth Amendment on their own.

### C. Qualified Immunity Does Not Apply to the District of Columbia's Unconstitutional Policies

The District Defendants' only ground for dismissing Count II is their claim that the searches were protected by qualified immunity.  Mot. at 10-12.  But "[m]unicipalities…do not enjoy absolute or qualified immunity from § 1983 suits."  *Leatherman*, 507 U.S. at 163 (citations omitted).  Thus, regardless of whether it was "clearly established" that invasively searching segregated inmates without reasonable suspicion—and then re-searching them again for no reason—violates the Fourth Amendment, the District cannot avoid liability for these unconstitutional policies.

## IV. Plaintiff Has Adequately Pled Deliberate Indifference by Ms. Gaines and Ms. Blair-Summers Under § 1983

Deliberate indifference in the prison context violates the Fifth and Eight Amendments.  *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 851-52 (1998).  As the Supreme Court explained in *Lewis*, "in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but *obligatory* under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare."  *Id*. (emphasis added).  This "liability for deliberate

indifference to inmate welfare rests upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Id*. at 853. "When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." *Id.*

The District Defendants cite *Lewis*, but ignore its teaching. Rather, they once again resort to the fiction, unalleged in the Amended Complaint, that the CDF employees who imprisoned Mr. Jones acted in good faith reliance on a "facially valid warrant." Mot. at 13. As explained above, Mr. Jones was arrested pursuant to a facially-incomplete NCIC report, not a "facially valid warrant." But in any event, by the time Ms. Blair-Summers or Ms. Gaines interacted with Mr. Jones, he had already returned from Superior Court after being cleared of all charges. He was then processed into CDF not because of the original wrongly-executed warrant, but because USMS and CDF employees assumed without any verification that there was outstanding time remaining on his BOP sentence. AC ¶ 52. In sum, there was simply no facially-valid document of any kind justifying Mr. Jones's detention at CDF for any period of time.

Thus, when Mr. Jones directly informed Ms. Blair-Summers and Ms. Gaines that he had completed his BOP sentence, their deliberate failure to take any action to verify the lawfulness of Mr. Jones's detention was the embodiment of deliberate indifference. *See Moore v. Tartler*, 986 F.2d 682, 686 (3d Cir. 1993) ("Deliberate indifference has been demonstrated in those cases where prison officials were put on notice and then simply refused to investigate a prisoner's claim of sentence miscalculation.") (citing *Alexander v. Perrill*, 916 F.2d 1392, 1398 (9th Cir. 1990) ("[P]rison officials who are under a duty to investigate claims of computational errors in the calculation of prison sentences may be liable for their failure to do so when a reasonable request is made")); *Haygood v. Younger*, 769 F.2d 1350, 1355 (9th Cir. 1985) (prison officials' failure to

investigate a claim that a prisoner's sentence had been miscalculated, after being put on notice, is sufficient to establish liability for deliberate indifference); *Campbell v. U.S. Parole Comm'n*, 563 F. Supp. 2d 23, 26 (D.D.C. 2008) ("[D]etention beyond the expiration of a sentence may constitute cruel and unusual punishment if it is the result of deliberate indifference to a prisoner's liberty interest or violates due process.") (citing *Haygood*, 769 F.2d at 1355).

That is especially true here, since Ms. Gaines—a case manager—and Ms. Blair-Summers—a legal instrument examiner—were specifically employed by the DOC to protect inmates' rights and attend to inmates' needs.  Had they cared to do so, they could have easily verified the unlawfulness of Mr. Jones's detention by simply accessing his sentence computation data on their own computers, or by placing a two-minute phone call to the BOP.  AC ¶ 71.  Yet for eight weeks, they did *nothing*, despite Mr. Jones's constant pleas, and despite their failure to ever consult any detention document indicating how long Mr. Jones should be detained.  AC ¶ 66-67.  Worse, this indifference occurred over Thanksgiving and Christmas, two of the most sacred family holidays of the year.  AC ¶ 72.  Without any lawful basis, Mr. Jones was left imprisoned in a stark jail cell, with his two young daughters wondering whether or when their father would come home, *id.*, while Ms. Gaines and Ms. Blair-Summers presumably enjoyed turkey and football with their respective families.  Given all the daily humiliation and risks of a prison environment, not to mention the loss of liberty itself, this "protracted failure even to care" during the most important two holidays of the year, by "prison officials" employed specifically to protect the rights of inmates, was "truly shocking."  *Lewis*, 523 U.S. at 853.

## V.   Plaintiff Has Adequately Pled Liability by the District of Columbia and Warden Smith for Deliberate Indifference Under § 1983

A municipality is liable under § 1983 for "the failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to

the risk that not addressing the need will result in constitutional violations." *Baker v. D.C.*, 326 F.3d 1302, 1306-07 (D.C. Cir. 2003).  *See also Smith v. D.C.*, 413 F.3d 86, 98 (D.C. Cir. 2005) ("[G]overnment failure to set standards or train employees can sometimes amount to an unconstitutional policy or custom.") (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989) ("[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.  In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible.")).  "Deliberate indifference is determined by analyzing whether the municipality knew or should have known of the risk of constitutional violations, an objective standard." *Baker*, 326 F.3d at 1306-07.

Although courts typically require a pattern of similar constitutional violations, a pattern is not required when the "'unconstitutional consequences of failing to train [are] patently obvious.'" *Robinson v. Pezzat*, No. 15-7040, ___F.3d___, 2016 WL 1274044 *10 (D.C. Cir. Apr. 1, 2016) (quoting *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011)).  Accordingly, a municipality can be liable for even a single constitutional violation when:

> [1] a policymaker knows "to a moral certainty" that city employees will confront a particular situation; [2] the situation either presents the employee with "a difficult choice of the sort that training or supervision will make less difficult" or "there is a history of employees mishandling the situation;" and [3] "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

*Wray v. City of New York*, 490 F.3d 189, 195-96 (2d Cir. 2007) (quoting *Walker v. City of New York*, 974 F.2d 293, 297-298 (2d Cir. 1992)).

Here, the Amended Complaint adequately alleges that Warden Smith and the District of Columbia knew to a "moral certainty" that case managers and legal instrument examiners at CDF

would face the situation of inmates held for lengthy periods of time due to errors in their sentencing calculation or in interagency detention requests; that such employees had "a history of…mishandling the situation"; and that any mishandling of those situations in the future would *inevitably* "cause the deprivation of a citizen's constitutional rights." *Id.*[4]  Accordingly, Warden Smith's failure to provide adequate training, supervision, and procedures to prevent and shorten such lengthy, non-routine overdetentions constitutes deliberate indifference to "patently obvious" unconstitutional consequences. *Pezzat*, ___F.3d at ___, 2016 WL 1274044 at *10.

The District Defendants contend that it is irrelevant that Warden Smith and the District had actual or constructive knowledge of the ongoing problem of lengthy overdetentions caused by errors in the calculation of release dates, including errors by federal agencies upon which CDF employees blindly relied. Mot. at 15 (citing AC ¶¶ 116-22).  On the contrary, overdention due to errors in the calculation of release dates is directly relevant to Mr. Jones's detention, since it was caused by the failure of CDF employees, including Defendants Gaines and Blair-Summers, to discover that his release date had passed three days prior to his intake at CDF.

---

[4] The Amended Complaint contains six full pages of allegations specifically outlining:  (i) the past problems of overdetention in the District of Columbia; (ii) the extent to which those problems were known to Warden Smith and the District through class action and individual lawsuits; (iii) efforts taken by the District to address some of those problems pursuant to court-supervised settlement orders; (iv) the apparent lack of implementation and/or failure of those procedures as evidenced by this case; (v) Warden Smith's and the District's awareness of the need for specific training and procedures in the context of interagency requests for detention; (vi) Warden Smith's and the District's awareness that without such procedures, the interagency context had the potential to cause extremely lengthy overdetentions that were far more harmful than those at issue in prior class action litigation; (vii) the near-certainty that without additional training CDF employees would continue to violate the rights of inmates held due to interagency requests; and (viii) the failure of Warden Smith and the District to take any action to establish procedures or training protocols to address the extreme harm caused by the extreme length of non-routine overdetentions due to interagency requests.  AC ¶¶ 113-135.

The District Defendants also contend that the District's failure "to properly supervise and train employees on investigating inmate complaints is not 'deliberate indifference.'"  Mot. at 16 (citing *Moore v. Tartler*, 986 F.2d 682, 687 (3rd Cir. 1993) (affirming district court's conclusion that a "'slow and incompetent'" investigation of an inmate's claims that he is being wrongfully detained does not constitute "deliberate indifference")).   On the contrary, a failure to train employees in a context highly likely to lead to unconstitutional deprivations of inmate liberties is a classic example of deliberate indifference.  *Pezzat*, ___F.3d at ___, 2016 WL 1274044 at *10; *Wray*, 490 F.3d at 195-96.   Indeed, *Moore*, on which Defendants rely, fully supports that conclusion: it affirmatively acknowledged the "extremely serious concerns" raised by the appellant, and only found that there was no deliberate indifference because "the undisputed facts show that the parole board officials *were attempting to resolve the confusion* over the sentencing order and *were taking affirmative steps* during the five months toward that end."  986 F.2d at 687 (emphasis added).   Here, Warden Smith was aware of examples of CDF employees taking *no* affirmative steps to investigate inmate claims of wrongful detention, and thus that constitutional violations were almost certainly occurring.

Next, the District Defendants dismiss the relevance of a prior case cited in the Amended Complaint, *Wormley v. United States*, 08-cv-449 (RCL), in which an inmate under the supervision of Warden Smith was detained for five months despite her constant pleas to her case manager that she had satisfied her sentence.  According to the Defendants, *Wormley* was an isolated incident that does not demonstrate a pattern of constitutional violations.  Mot. at 17.  But *Wormley* was just one example of several *dozen* instances of overdetentions alleged in the Complaint, many of which were known by the District to be "caused by mistakes in calculating inmates' sentences by DOC or a federal entity, such as the BOP or USMS," and which "extended for much longer

periods of time and worked a much more extreme hardship on inmates" than the routine, 24-48 hour detentions at issue in prior class action litigation.  AC ¶ 120.  This more than adequately alleges awareness of an unconstitutional pattern under *Pezzat*, ___F.3d___, 2016 WL 1274044 at *10; and even if it did not, the "patently obvious" unconstitutionality of potential repeats of *Wormley* was enough to require action by Warden Smith and the District of Columbia, *id*.

Finally, the District Defendants argue that *Wormley* is irrelevant because it was an instance of "overdetention" rather than "unlawful detention."  Mot. at 15.  As a preliminary matter, it is difficult to understand the weight Defendants place on the term "overdetention": lengthy unlawful detentions caused by sentence miscalculations or interagency miscommunications are no less harmful than lengthy overdetentions caused by those same errors, and procedures implemented to fix the latter would equally encompass the former.  In other words, they are part and parcel of the same problem.  In any event, contrary to Defendants' claims, Mr. Jones *was* "overdetained"—he was held after he completed his BOP sentence on the false assumption that he had not completed his sentence, because Defendants Blair-Summers and Gaines failed to calculate and verify his release date.  AC ¶ 51-54.  He was thus subject to the same "overdetention" problem as any other inmate whose release dates were incorrectly calculated, or not calculated at all.  Since the Amended Complaint adequately alleges that Mr. Jones's detention was caused by Warden Smith's and the District's failure to supervise and train CDF employees on how to intervene and prevent lengthy overdetentions of the kind represented by *Wormley* and dozens of other cases known to them, Count V sufficiently alleges liability for deliberate difference under § 1983.

**VI.     Plaintiff Has Adequately Pled Each of His Common Law Claims**

    **A.     Plaintiff Has Adequately Pled a Claim for False Imprisonment**

"[D]epriving someone of the ability to freely move for any amount of time, either by real force or the threat of force, will be sufficient to bring a claim for false arrest or false imprisonment." *Lyles v. Micenko*, 468 F. Supp. 2d 68, 74 (D.D.C. 2006) (citing *Marshall v. Dist. of Columbia*, 391 A.2d 1374, 1380 (D.C. 1978)).   Once adequately pleaded, a law enforcement defendant has an affirmative defense to a claim of false imprisonment if "in light of the law and circumstances known to him (including constructive knowledge) he honestly and reasonably thinks his actions are lawful."  *Marshall*, 391 A.2d at 1381; *see also Lyles*, 468 F. Supp. 2d at 74 ("The existence of probable cause for the arrest or imprisonment is a valid defense to a claim of false arrest or imprisonment.") (citing *Shaw v. May Dept. Stores Co.*, 268 A.2d 607, 609 (D.C. 1970)).

Defendants' motion to dismiss the false imprisonment count fails for the same reasons as its motion to dismiss the § 1983 claims.  With regard to Officer Stanford, he cannot claim to have reasonably relied on the NCIC bulletin in the face of Mr. Jones's self-reporting to CSOSA and CSOSA-generated release paperwork, since (i) the NCIC manual expressly states that "hits" like the one against Mr. Jones do not constitute probable cause; and (ii) the "hit" itself expressly stated *on its face* that verification with the issuing agency was required before arrest.  And with regard to the separate period of detention from November 6, 2014 to January 2, 2015, the Amended Complaint does not allege that Mr. Jones was held pursuant to a "warrant," valid or otherwise. Rather, he was held because the Defendants unreasonably failed to ever determine whether (or how long) they could detain him when he returned from Superior Court without any charges

against him.[5]   Since the District Defendants had no reasonable basis to believe they had the authority to detain Mr. Jones at any point during his 58-day detention—and certainly not after he returned from Superior Court without any charges or pending cases—the District Defendants have no valid defense for their admittedly unlawful detention of Mr. Jones.

### B.   Plaintiff Has Adequately Pled Invasion of Privacy

Invasive body-cavity searches of the kind imposed upon Mr. Jones have previously been determined to satisfy the elements of invasion of privacy by intrusion upon seclusion.   *See Helton v. United States*, 191 F. Supp. 2d 179, 186 (D.D.C. 2002).   Indeed, the visual inspection of concealed private parts lines up almost exactly with the three elements of the tort.[6]   The District of Columbia nevertheless argues that Count XII fails because Mr. Jones has not "plead[ed] facts from which to find he had any reasonable expectation of privacy from search upon arrival as an inmate at CDF, or that the routine search would be highly offensive to an ordinary, reasonable person in his situation."   Mot. at 19.   The District's claim that an invasive search of one's anal cavity and genitalia would not be "highly offensive to an ordinary, reasonable person" boggles the mind.   As the court explained in *Helton*,

> it is clear that a strip search can be humiliating and degrading. Being forced— allegedly without legal justification—to strip and squat in view of law enforcement officials to determine if one has any concealed contraband would be highly offensive to a reasonable person.   As the Seventh Circuit noted in *Mary*

---

[5] To the extent that the District Defendants did rely on a warrant from October 2014 to detain Mr. Jones for two months after he returned from Superior Court on November 6, 2014, as claimed in their motion, that reliance would be staggeringly incompetent, since they knew that Mr. Jones had been cleared of all charges, and there were no other court-issued detention documents.

[6] "'The tort of intrusion upon seclusion has three elements: (1) an invasion or interference by physical intrusion, by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination; (2) into a place where the plaintiff has secluded himself, or into his private or secret concerns; (3) that would be highly offensive to an ordinary, reasonable person.'"   *Helton*, 191 F. Supp. 2d at 181 (citing *Wolf v. Regardie*, 553 A.2d 1213, 1216-17 (D.C. 1989)).

> *Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir. 1983) . . . visual strip searches are "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission." 723 F.2d at 1272 (citing *Tinetti v. Wittke*, 620 F.2d 160 (7th Cir. 1980) ("In short, we can think of few exercises of authority by the state that intrude on the citizen's privacy and dignity as severely as the visual anal and genital searches practiced here.")).

191 F. Supp. 2d at 182. *See also Arruda v. Fair*, 710 F.2d 886, 887 (1st Cir. 1983) (stating that "all courts" have recognized the "severe if not gross interference with a person's privacy" that accompany visual body cavity searches).

Contrary to the District's argument, the fact that such searches may be "reasonable" under the Fourth Amendment in some circumstances does not make them any less offensive or a violation of privacy. *See Bell v. Wolfish*, 441 U.S. 520, 560 (1979) (upholding constitutionality of body-cavity searches but stating that "[w]e do not underestimate the degree to which these searches may *invade the personal privacy* of inmates") (emphasis added); *Florence*, 132 S. Ct. at 1524 (2012) (Alito, J.) (concurring in judgment affirming constitutionality of strip-search but stating that "[u]ndergoing such an inspection is undoubtedly humiliating and deeply offensive to many," and that for certain persons, "admission to the general jail population, with the concomitant humiliation of a strip search, may not be reasonable"). Indeed, the District previously raised and lost this precise argument in *Helton*. *See* 191 F. Supp. 2d at 183 (rejecting District of Columbia's argument that "'plaintiffs here must be able to show that the Deputy Marshals violated the Constitution in order to assert a tort claim based on District of Columbia law'") (quoting District's motion to dismiss).

Moreover, even if Fourth Amendment "reasonableness" were dispositive in the invasion-of-privacy context, the District's assertion that "the reasonableness of the routine search has already been upheld in the D.C. Circuit," *id.* (citing *Bame*, 637 F.3d at 387), completely mischaracterizes the law. As explained above, *Bame* only addressed whether it was "clearly

established" in 2002 that routine strip-searches were *unconstitutional*.   The opinion expressly declined to address whether such searches *were* constitutional.   Moreover, when the Supreme Court addressed that question a year later in *Florence*, it expressly limited its approval of routine strip-searches of inmates destined for the "general population of a jail," and a majority of the Court indicated that arrestees held in areas separate from the general population (such as the Central Cell Block) could *not* be subjected to routine strip-searches.   Thus, under the views of a majority of the current Supreme Court, there is little question that absent reasonable suspicion, both of the searches imposed upon Mr. Jones would be held to be unreasonable—the first because Mr. Jones was segregated form the general population of CDF, and the second because he had already been strip-searched and had had no contact with any non-searched individuals.

Finally, and fatally, the District completely ignores the impact of the unlawfulness of Mr. Jones's detention on the reasonableness of his privacy interests.   Even if lawfully-arrested and detained inmates do not have privacy interests in their genitals and rectums, ordinary citizens do.   Since there was never a valid basis for the District to arrest Mr. Jones—much less a valid reason to admit him into CDF when he returned from Superior Court without any charges or detention documents—he had just as much right as anyone else to the privacy and integrity of his body cavities.   Accordingly, the District's assertion that *Bame* upheld the constitutionality of routine strip searches of lawfully-detained inmates is as irrelevant as it is false.   There was no lawful reason for Mr. Jones to be arrested on November 5, 2014 or processed into the general population of CDF on November 6, 2014, and thus no possible basis for the District to claim that his privacy was not violated on those dates by the invasive, humiliating full body-cavity strip searches to which he was subjected.

### C.     Plaintiff Has Adequately Pled Negligence

The District Defendants' motion to dismiss the negligent count is based entirely on the argument that there is no "duty to discover or correct errors in facially valid detainers, sentencing orders, or warrants." Mot. at 20 (citing *McAllister v. District of Columbia*, 653 A.2d 849, 852 (D.C. 1995)).   Again, this argument fails, because the District Defendants did not rely on any detainer, sentencing order, or warrant for the 57 days they detained Mr. Jones after he returned from Superior Court, much less a "facially valid" one.   Rather, Mr. Jones was held because the District Defendants negligently processed him into CDF without first checking to see whether he actually owed time on his BOP sentence, and then continued to hold him indefinitely despite his pleas that he had completed his sentence.   That failure violated their duty, as Mr. Jones's custodian, not to negligently subject him to unlawful detention while he was in their custody.[7] *See* Restatement (2d) of Torts § 314A(4) ("One who is required by law to take or voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty [to take reasonable action to protect them against unreasonable risk of physical harm] to the other.")).

Moreover, Ms. Gaines in particular had a "special duty" toward Mr. Jones.   *See Platt v. D.C.*, 467 A.2d 149, 151 (D.C. 1983) (finding that a "special duty" by government official exists where there is "(1) a direct contact or continuing contact between the victim and the governmental agency or official; and (2) a justifiable reliance on the part of the victim") (citing *Warren v. District of Columbia*, 444 A.2d 1, 11 (D.C. 1981)).   As alleged in the Amended Complaint,

---

[7] Oddly, the District Defendants do not rely on the Form USM-41 issued by the USMS requesting that Mr. Jones be held "pending federal designation" by the BOP. AC ¶ 53.  Any reliance on that document would be unavailing, however, since it did not provide any independent authority for CDF to detain Mr. Jones beyond the satisfaction date of his existing sentence.  It was Ms. Blair-Summers's job to calculate that satisfaction date, a job she negligently performed at intake.

Ms. Gaines had regular, direct, and continuing contact with Mr. Jones for eight weeks, and Mr. Jones justifiably relied on her repeated assurance that she would contact the BOP and inquire into the reasons for his detention.  AC ¶ 66-67.  Her failure to do so breached this special duty of care created by her own assurances to Mr. Jones, who was placed into her care as his case manager.

Notably, former Chief Judge Lamberth rejected an identical attempt by D.C. correctional employees to dismiss negligence claims in *Wormley*, 601 F. Supp. 2d at 44.  There, like here, the plaintiff's case manager repeatedly promised to look into the reasons for the plaintiff's overdetention, but failed to do so for over five months.  The defendants, like the District Defendants here, moved to dismiss the claim of negligence based on the holding in *McAllister* that correctional employees had no duty to correct an error in a judge's sentencing order.  Noting the high bar for dismissing a complaint on the pleadings, the court rejected the defendants' reliance on *McAllister*:

> [P]laintiff plausibly claims that defendants did have authority to respond to plaintiff's inquiries, investigate her claims, and inform DOC of her situation, which may have prevented at least some of her overdetention.  The Court need not at this stage determine whether [the correctional] defendants in fact owed a duty to plaintiff or whether plaintiff was in fact unlawfully detained.  Plaintiff does state a claim that could *plausibly* entitle her to relief.  Accordingly, plaintiff's common-law claims against [the correctional] defendants cannot be dismissed….
>
> Contrary to defendants' assertions, that case [*McAllister*] in no way mandates that this claim be dismissed.  All that plaintiff must do at this stage—faced with defendants' Motion to Dismiss—is state a claim for relief that is plausible on its face.  Plaintiff's claim—that the ordinary duty of care, together with [the case manager's] offers of assistance, support the existence of a duty—is sufficient to defeat defendants' motion.

*Wormley*, 601 F. Supp. 2d at 44-45 (emphasis in original).

### D.     Plaintiff Has Adequately Pled Negligent Supervision

The District Defendants do not contest that Warden Smith owed a duty of care to supervise CDF employees to prevent unconstitutional overdetentions, or that he breached that duty by failing to train and supervise Defendants Gaines, Proctor, and Blair-Summers.  Neither do they contest that Mr. Jones suffered damages as a result of his two-month-long incarceration.  Rather, the District Defendants' sole challenge to the negligent supervision count is that "plaintiff does not allege he was overdetained," and therefore "Warden Smith's alleged failure to review or implement audits on overdetention cannot be the proximate cause of plaintiff's injuries."  Mot. at 21.

However, as explained above, Mr. Jones *is* alleging overdetention.  After being informed that Mr. Jones was cleared of all charges related to his "escape," CDF employees continued to detain Mr. Jones on the mistaken assumption that time remained on his original BOP sentence.  AC ¶ 51-54.  Since he was detained beyond the satisfaction date of that sentence, Mr. Jones was in the same position as any other victim of overdetention whose release dates were incorrectly calculated, or not calculated at all.  Because Mr. Jones is alleging overdetention, it follows that his injury was proximately caused by Warden Smith's failure to train and supervise his staff to avoid overdetentions, and the District Defendant's motion to dismiss should be denied.

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

Dated:  May 16, 2016                          Respectfully submitted,

                                              _____
                                              Matthew J. Peed (DC Bar No. 503328)
                                              Matt@ClintonBrook.com
                                              **CLINTON BROOK & PEED**
                                              1455 Pennsylvania Ave NW, Suite 400
                                              Washington, DC  20004
                                              Tel: (202) 621-1828
                                              Fax: (202) 204-6320

                                              *Attorney for Plaintiff Andrew Jones*


## CERTIFICATE OF SERVICE

        I, Matthew J. Peed, hereby certify that on May 16, 2016 I caused a true and correct copy of Plaintiff's Opposition to Defendants' Motion to Dismiss to be served on the attorney for Defendants District of Columbia, William Smith, Stephen Stanford, Annette Blair-Summers, and Tia Gaines via the Court's ECF system.

                                              _____
                                                    Matthew J. Peed